UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11264-RGS

LUCIANO MANGANELLA,

v.

EVANSTON INSURANCE COMPANY


EVANSTON INSURANCE COMPANY,
Plaintiff-in-counterclaim
and third-party plaintiff

v.

LUCIANO MANGANELLA,
Defendant-in-counterclaim and
JASMINE COMPANY, INC. and
DONNA BURGESS, Third-party defendants

MEMORANDUM AND ORDER ON
LUCIANO MANGANELLA'S MOTION FOR PARTIAL SUMMARY JUDGMENT
and EVANSTON INSURANCE CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT

October 26, 2010

STEARNS, D.J.

In this action, plaintiff Luciano Manganella seeks a declaratory judgment that

defendant Evanston Insurance Company (Evanston) has a duty to defend and indemnify

him against a charge of sexual harassment brought by a former employee, Donna

Burgess. At issue is the scope and extent of coverage under an Employment Practices

Liability Insurance (EPLI) policy purchased from Evanston by Manganella's former

employer, Jasmine Company, Inc. (Jasmine). Manganella moves for partial summary

judgment on the duty to defend claim. Evanston cross-moves for a summary disposition,

arguing that the allegedly offensive conduct did not occur entirely within the coverage period.[1]  In the alternative, Evanston argues that Manganella's "conduct in intentional disregard of applicable law" (the sexual harassment claim) as "established . . . in two prior adjudications," falls within the policy's Intentional Acts Exclusion.

<u>BACKGROUND</u>

In 1970, Manganella founded JasmineSola, a women's clothing boutique.  As the business flourished, it was rebranded as Jasmine.  Manganella was the sole shareholder and president of Jasmine until he sold the company on July 19, 2005, to Lerner New York, Inc. (Lerner).  Under the terms of a Stock Purchase Agreement (SPA), Manganella agreed to continue as Jasmine's president for three years.

In 1998, Jasmine was sued by Sonia Bawa, a former employee, for sexual harassment.  In the wake of the lawsuit, Manganella caused Jasmine to purchase an EPLI policy from Evanston.  The  initial insurance application was completed and signed on November 10, 1998, by Manganella and Burgess, who was then Jasmine's Human Resources Manager.   The application stated that, with the exception of the Bawa complaint, Jasmine was not aware of any outstanding instances, real or alleged, of claims of wrongful employment practices (including sexual harassment).  Barnett Aff. - Ex. 3 (EPLI Application).  In signing the application, Manganella and Burgess "warrant[ed] that to the best of [their] knowledge and belief that the statements set forth [t]herein [were] true and include[d] all material information."  <u>Id</u>.  On November 13, 1998, Burgess submitted an

---

[1]The EPLI policy covered conduct is alleged to have been committed in its entirety after April 28, 1999.

affidavit in the Bawa case stating that: (1) she had overseen personnel matters at Jasmine since September of 1997; (2) she shared an office with Manganella; and (3) she was privy to "office gossip."  "Nonetheless at no time ha[d she] ever witnessed or heard from anyone associated with the company . . . that Mr. Manganella committed any acts of sexual harassment directed towards Ms. Bawa *or others*."[2]  Barnett Aff. - Ex. 4 (1998 Affidavit) (emphasis added).

Jasmine's coverage from Evanston consisted of a series of one-year policies, the first of which took effect on April 28, 1999.  Each year thereafter, through April of 2005, Jasmine completed a renewal application and was issued a new policy.  Manganella Aff. ¶ 4.  The policies provided coverage for damages incurred because of "Claims" made during the policy period or during an Extended Reporting Period by reason of any "Wrongful Employment Practice," provided that the entirety of the wrongful conduct had taken place during the policy period (as amended by the "Retroactive Date," namely April 28, 1999.).  EPLI Policy, Part III(1).  A "Claim" was defined by the policy as "any written charge or lawsuit, including a charge filed with the Equal Employment Opportunity

_____

[2]Evanston points out that in signing the insurance application on November 10, 1998, Burgess indicated (by checking a box) that she was "*aware* of actual or alleged wrongful employment practices or other facts, incidents or circumstances that may result in claims" against Jasmine. (Emphasis added).  Evanston adds that only Manganella signed the supplement to the application in which he identified and denied the Bawa allegations.  See Barnett Aff. - Ex. 32.  Evanston contends that there is no basis for limiting Burgess's affirmation of awareness to the Bawa case, that is, that she could have been alluding to Manganella by not adding an addendum to her checkmark.  However, there is nothing in the parts of the application completed by Burgess that indicates that she had anyone other than Bawa in mind.  Three days after signing the insurance application, Burgess stated under oath in a court filing that at no time had she witnessed or heard that Manganella had sexually harassed anyone.  Id. - Ex. 4.

3

Commission or similar state or local entity with jurisdiction over employment disputes, seeking 'Damages' or other relief for a 'Wrongful Employment Practice.'" EPLI policy, § I(1).  The policy defined a "Wrongful Employment Practice" as conduct with respect to "a current, prospective or former employee that allegedly culminated in . . . a violation of any state, federal or local civil rights or anti-discrimination law and/or fair employment practices law . . . ."[3] See EPLI policy, Part I(7).

Evanston issued a renewal EPLI policy (No. EP-261249) to Jasmine for the period April 28, 2005, to April 28, 2006.  See McDonough Aff. ¶ 2.  On January 3, 2006, Jasmine cancelled the policy and purchased Extended Reporting Period coverage for claims made and reported during the thirty-six months following the effective date of the cancellation. Consistent with the terms of the policy, the Extended Reporting Period endorsement required that any claims made during the period arise out of a Wrongful Employment Practice alleged to have been committed between the Retroactive Date of April 28, 1999

---

[3]In its entirety, the section reads as follows:

"Wrongful Employment Practices" means conduct of an insured with respect to a current, prospective or former employee that allegedly culminated in (i) wrongful termination (including constructive discharge) of an employee (ii) violation of any state, federal or local civil rights or anti-discrimination law and/or fair employment practices (including, by way of example of federal laws, but not limited to Title VII of the Civil Rights Act of 1964 and the amendments thereto, the Age Discrimination in Employment Act and amendments thereto, and the Fair Labor Standards Act and amendments thereto, the Family Medical Leave Act of 1992 and amendments thereto, the Uniform Services Employment and Re-employment Rights Act and amendments thereto, and the Fair Credit Reporting Act and amendments thereto); and/or (iii) commission of a common law tort arising out of and in the course of employment except to the extent that the tort allegedly results in Bodily Injury or property damage.

and the extended date of cancellation.

The policy also contained an "Intentional Acts Exclusion" barring coverage of any

claim made against the Insured

> based on conduct of the Insured or at the Insured's direction that is
> committed with wanton, willful, reckless or intentional disregard of any law
> or laws that is or are the foundation for the Claim, or with criminal or
> malicious purpose or intent; but this exclusion shall not apply to the strictly
> vicarious liability of any Insured for the wanton, willful, reckless or intentional
> disregard of another of any law or laws that is or are the foundation for the
> Claim.

Barnett Aff. - Ex. 1 at IV(1).[4]

In May of 2006, Burgess complained to Lerner that she had been sexually harassed

by Manganella.   Lerner hired outside counsel to investigate Burgess's complaint.

Manganella was placed on unpaid administrative leave.   On June 22, 2006, Lerner

terminated Manganella's employment citing a "Major Employment Breach"[5] of the SPA –

specifically that Manganella had sexually harassed four female Jasmine employees,

including Burgess, and had downloaded sexually-graphic images on company computers.

---

[4]The policy defined the "Insured" in relevant part as follows:

Each of the following is an insured under this insurance to the extent set
forth below:

   1.  The Named insured is herein defined as the individual,
partnership or corporation named in the Declarations;
   2.  Any partner, officer, director, stockholder, or employee of the
named insured solely while acting within the scope of his duties as such; .
. . .

[5]A Major Employment Breach is "(ii) the willful refusal of the Shareholder to comply
with any significant, lawful and proper policy, directive or decision . . . if not remedied
within thirty days after receipt of written notice from the Company. . . ."  Barnett Aff. - Ex.
7 (SPA) § 6.16(E).

Lerner claimed that Manganella's conduct had also violated Lerner's "Code of Business Conduct."[6]   Lerner demanded that Manganella forfeit $7 million of escrowed funds that were to be paid to him upon his satisfactory completion of performance under the SPA. Manganella was asked to sign a form waiving his right to the funds by June 29, 2006.[7] Manganella refused to sign the waiver.

On June 29, 2006, Lerner invoked the arbitration clause of the SPA.  The same day, Lerner turned to this court for an order enjoining the distribution of the escrowed funds.[8]

---

[6]Lerner's Code of Conduct in relevant part provides:

Executive officers, Directors, and managers have the additional responsibility to lead by example, ensure that other Associates understand and comply with this Code, foster an environment that promotes compliance, and ensure that other Associates understand how to report concerns and understand that there will be no retaliation for doing so.

* * *

We are committed to maintaining a workplace entirely free from illegal discrimination or harassment.  We will not tolerate harassment related to any individual's race, color, religion, gender, national origin, citizenship, age, disability, sexual orientation or marital status.

* * *

The term "harassment" may include unwelcome slurs and other offensive remarks, jokes and other verbal, graphic or unwelcome physical conduct. Harassment may also include unwelcome sexual advances, requests for sexual favors or unwelcome or offensive touching and other verbal, graphic or physical conduct of a sexual nature (such as obscene or lewd jokes, comments or displays or any inappropriate body contact).

Barnett Aff. - Ex. 12 at 9.

[7]Under the terms of the SPA, $7 million of the $22.5 million cash component of the purchase price for Jasmine was placed in escrow to be returned to Lerner in the event of a Major Employment Breach.  The escrowed funds were to be disbursed in July of 2006.

[8]The court granted the requested preliminary injunction on July 12, 2006.

Manganella responded by filing suit against Lerner, also on June 29, 2006, in the Massachusetts Superior Court.  Manganella's state court suit alleged that Lerner had breached the SPA by terminating his employment.[9]  On August 9, 2006, Manganella's counsel notified Evanston of the Lerner litigation, and asked for a defense and coverage in the arbitration proceeding.[10]

After discovery, including the taking of the depositions of Burgess and the three other women who complained of sexual harassment by Manganella, the arbitration panel convened to hear evidence in November and December of 2006.  Thirteen witnesses testified.  On April 20, 2007, the arbitrators issued a twenty-page ruling, finding that while Manganella had willfully engaged in sexual harassment in breach of the SPA and Lerner's Code of Conduct, Lerner had failed to provide Manganella with the called-for notice and opportunity to "remedy" the violation.  The arbitrators awarded Manganella the escrowed funds, together with $305,291.25 in interest and $2 million in attorneys' fees and costs.[11]

---

[9]In October of 2007, the Superior Court found on cross-motions for partial summary judgment that Lerner had justifiable grounds to terminate Manganella.  However, prior to any ruling on the remainder of Manganella's claims, the parties settled the Superior Court case and filed a Stipulation of Dismissal.

[10]On December 4, 2006, Evanston filed an action in this court against Manganella and Lerner (No. 06-CA-12175-PBS), seeking a declaratory judgment that Manganella was not entitled to coverage under the policy for the costs of the arbitration proceeding and various related actions, including the Superior Court litigation. The parties reported to Judge Saris at a May 2007 scheduling conference that the case had been settled.

[11]Manganella's Application for Fees and Costs requested $2,221,712 in fees and expenses.  Manganella asserts that, as a result of Evanston's denial of a complete defense, he (or his attorneys) amassed $221,712 in unreimbursed fees in connection with the arbitration.  Evanston responds that the arbitrators expressly found that "an award of $2,000,000 for all of Respondent's attorneys fees and costs is fair and reasonable." See Barnett Aff. - Ex. 15 at 2.

The United States District Court for the Southern District of New York confirmed the arbitration award on August 8, 2007.

On March 19, 2007, Burgess filed a charge of discrimination against Manganella, Lerner, and Jasmine with the Massachusetts Commission Against Discrimination (MCAD). The charge alleged that Burgess had worked for Jasmine and Manganella from 1997 to 2006, and that "[t]hroughout her employment with JasmineSola, Manganella subjected Ms. Burgess to nearly constant physical and verbal sexual harassment."[12]  See Barnett Aff. - Ex. 20 (MCAD Charge ¶ 1, ¶ 3).  Burgess also alleged that "Manganella intimidated [her] into engaging in sexual acts with him on the premises of JasmineSola and in other business locations on five occasions . . . ."  Id. at ¶ 1.  Manganella denied all of Burgess's allegations and moved to dismiss the charge on, among other bases, statute of limitations grounds.  The MCAD denied the motion.[13]

On March 29, 2007, Manganella requested a defense and coverage under the EPLI policy in the MCAD proceeding.  In a letter dated April 11, 2007, Evanston stated that it had compared the allegations of Burgess's MCAD charge with the provisions of the policy and with statements made in the policy applications.  It denied Manganella coverage on grounds that the "Wrongful Employment Practice" had not occurred in its entirety between April 28, 2009 and the Extended Reporting Period.  The letter also "call[ed] attention" to

---

[12]While inconsistent with her statements in the EPLI application, the affidavit filed in the Bawa case, the statements given to Lerner's investigator in May of 2006, and Burgess's MCAD charges parallel those she made in her deposition and in her testimony to the arbitration panel.  Compare MCAD Charge ¶¶ 14-17 with Barnett Aff. - Ex. 10 at 876-879.

[13] The MCAD issued a finding of probable cause on June 30, 2008.

the Intentional Acts Exclusion of the policy.

In May of 2008, Manganella asked Evanston to reconsider the denial of coverage and provided Evanston with the testimony given by Burgess in the course of the arbitration proceeding.[14]   Evanston declined to reconsider.   On January 16, 2009, Manganella renewed his objection to the denial of coverage, pointing out that in Burgess's 1998 Bawa affidavit, she had stated under oath that she knew of no other acts of sexual harassment and that this declaration was inconsistent with the allegation that she had been harassed "throughout" her employment with Jasmine, as stated in her MCAD charge.   On January 27, 2009, Evanston again declined coverage.   Manganella filed this lawsuit on July 19, 2009.

<u>DISCUSSION</u>

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004), citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-250 (1986).

"[T]he initial duty of a liability insurer to defend third-party actions against the

---

[14]A confidentiality order issued in conjunction with the arbitration proceeding prevented Manganella from discussing the case or earlier providing Evanston with the Burgess deposition transcript or Lerner's investigative report.   <u>See</u> Pl. Mem. at 16; Pl. Reply Mem. at 6; Rosenfeld Aff. ¶ 4.

insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must  undertake the defense." Great Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 160 (1st Cir. 2007), quoting Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 318 (1983).  See also Cont'l Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146 (1984). The scope of an insurer's duty to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer." Desrosiers v. Royal Ins. Co. of Am., 393 Mass. 37, 40 (1984).  Nonetheless, when the allegations in the underlying complaint "lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate" or to defend the claimant.  Terrio v. McDonough, 16 Mass. App. Ct. 163, 168 (1983); see also Metro. Prop. & Gas, Co. v. Fitchburg Mut. Ins. Co., 58 Mass. App. Ct. 818, 820 (2003) (no duty to defend a claim specifically excluded from coverage).

An insured bears the initial burden of proving coverage under a policy. Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir. 1997) (applying Massachusetts law).  If the insured demonstrates the existence of coverage, the burden shifts to the insurer to prove that an exclusion applies. Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 231 (1997) ("[W]here the exception is in another separate and distinct clause of the . . . contract . . . then the burden is upon the party relying on such exception").

Manganella claims that the allegations of Burgess's MCAD charge, read liberally in his favor as the insured, are "reasonably susceptible" of an interpretation that they state a claim within the coverage of the policy.  This is because a finder of fact could determine

that Manganella's conduct did not occur or did not constitute sexual harassment, or they could find that while his conduct was illegal, it occurred in its entirety after the Retroactive Date.  Manganella adds that Evanston also had information extrinsic to the MCAD charge that militated in favor of a duty to defend, namely Burgess's 1998 Affidavit in the Bawa case. Finally, Manganella contends that Evanston breached its express contractual obligation to investigate the basis of coverage.  "Simply put, Evanston ignored all of the rules governing an insurer's conduct when evaluating its defense obligations . . . to avoid its duty to fund Manganella's defense of complicated sexual harassment claims." Pl. Mem. at 3.

Evanston relies on the statement in Burgess's charge that the harassment occurred throughout her employment with Jasmine (which began in 1997), that is, that it commenced prior to the April 28, 1999 Retroactive Date.  Evanston also points to the Intentional Acts Exclusion of the policy and argues that two prior adjudications (the arbitration proceedings and Superior Court case) have established both that Manganella's harassment of Burgess was willful and that it was committed with knowledge that it was unlawful.

The court agrees with Manganella that a material dispute of fact exists as to whether the alleged Wrongful Employment Practice occurred entirely within the insured period, that is, from April 28, 1999, to April 28, 2006.  While Burgess stated in her MCAD charge that she began working for Jasmine in September of 1997, and that "Manganella subjected [her] to nearly constant physical and verbal sexual harassment," she specified no dates – only that Manganella harassed her "throughout her employment."  Moreover, Evanston had in its file the initial EPLI application in which Burgess stated that, with the

11

exception of the Bawa complaint, as of November 10, 1998, she personally was unaware of any other actual or alleged Wrongful Employment Practices at Jasmine.   Moreover, Burgess had filed a sworn statement in the Bawa case in November of 1998, attesting that she was privy to "office gossip" and "at no time ha[d she] ever witnessed or heard from anyone associated with the company including Ms. Bawa that Mr. Manganella committed any acts of sexual harassment directed towards Ms. Bawa *or others*." [15] Barnett Aff. - Ex. 4 (Burgess Aff. ¶ 3) (emphasis added).   At a minimum, Evanston had a duty to investigate the inconsistency between its own records and Burgess's MCAD charge before choosing the version of facts that justified a denial of coverage, while ignoring another under which coverage attached.   Given this material dispute of fact, Evanston's denial of a defense and coverage on grounds that Manganella's conduct could not have occurred entirely within the covered period was improper.

In the alternative, Evanston relies on the International Acts Exclusion of the policy. "Interpretation of the language of [an] exclusion presents a question of law. . . . In this interpretation, we are guided by three fundamental principles: (1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words. . . . (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, . .

---

[15]Evanston claims that it did not have access to this affidavit until recently as there was a confidentiality order issued as to certain exhibits filed with the arbitration panel. Evanston makes the conclusory and unpersuasive argument that the EPLI Policy application dated November of 1998 "does not cast any doubt on the fact that, in 2007, Ms. Burgess was in fact alleging harassment 'throughout' her employment at Jasmine starting in 1997." Evanston Opp. at 9.

. and (3) doubts created by any ambiguous words or provisions are to be resolved against the insurer." Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 323-324 (1991). On the issue of the application of a policy exclusion, the burden of showing the absence of coverage rests with the insurer. Great Sw. Fire Ins. Co. v. Hercules Building & Wrecking Co., 35 Mass. App. Ct. 298, 302 (1993); Noseworthy v. Allstate Life Ins. Co., 40 Mass. App. Ct. 924, 927 (1996).[16]

Evanston argues that in both the Superior Court case and the arbitration proceeding, the harassment charges were litigated and established as constituting intentional and deliberate conduct. In order for an adjudication to be binding on a party in a subsequent action, four elements must be met: (1) a valid and final judgment on the merits in the prior adjudication; (2) that the party against whom estoppel is asserted was a party or in privity with a party to the prior litigation; (3) that the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior adjudication was essential to the earlier judgment. See Green v. Brookline, 53 Mass. App. Ct. 120, 123 (2003). "An issue may be 'actually' decided even if it is not *explicitly* decided, for it may have constituted, logically or practically, a necessary component of the decision reached in the prior litigation." Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30-31 (1st Cir. 1994).

---

[16]Manganella denies Burgess's allegations, contending somewhat unconvincingly that her charge does not allege that he "knew that the alleged conduct was unlawful at the time he committed it." Pl. Mem. at 18.

The parties agree that the arbitration was a final judgment.[17]  It is also clear that privity is not in dispute.[18]   While the arbitrators took pains to preserve the anonymity of the female complainants, Manganella concedes that one of the complainants referenced in the arbitrators' decision was Burgess.  Manganella, however, attempts to generate a dispute of fact over the issue of identicality.  On this point, the arbitrators' decision is instructive.  In relevant part, the arbitrators found as follows.

> We find, despite his protestations to the contrary, that [Manganella] was well acquainted with the Company's policy on sexual harassment and other acts of inappropriate conduct.  We find that he did not comply with the policy on sexual harassment and that his refusal was willful.  The requirement of willful refusal was satisfied based on the evidence presented to the Panel in this proceeding.
>
> *    *    *
>
> As to Manganella's compliance with the [sexual harassment] policy, his denials of sexual advances were not established but rather what was established by the record is that he sexually propositioned several women employees and inappropriately touched and propositioned one of these employees.
>
> *    *    *
>
> What makes this proceeding difficult is the reprehensible nature of [Manganella's] conduct and his lack of forthrightness.  He knew better and he owed the women who testified conduct associated with leaders.  The women employees who testified in this proceeding were forthright,

---

[17]Manganella argues that because the Superior Court action was settled mid-course by a stipulation of dismissal with prejudice, that action cannot be deemed a "final" adjudication for preclusion purposes.  But see United States v. Cunan, 156 F.3d 110, 114 (1st Cir. 1998) ("[A] voluntary dismissal with prejudice is ordinarily deemed a final judgment that satisfies the res judicata criterion.").  See also Fed. R. Civ. P. 41(a)(1).  Because of the preclusive effect of the arbitration decision, the court need not address the parties' arguments over the significance of the Superior Court ruling.

[18]"A party invoking issue preclusion need not show that it was privy to the first proceeding. . . .  It need only show that 'the *party against whom issue will be applied* had a fair opportunity to litigate the issue fully.'"  Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973 (1st Cir. 1995), quoting Kyricopoulos v. Town of Orleans, 967 F.2d 14, 16 (1st Cir. 1992).

courageous and wounded by [Manganella's] treatment of them.  He failed
terribly as a leader.

Barnett Aff. - Ex. 12 at 5, 12.[19]   Manganella argues that the decision established

Manganella's intent – "that the arbitration did not decide whether Manganella intentionally

harassed Burgess in violation of law . . . ."  Pl. Reply at 8-9.

This argument is impossible to square with the arbitrators' finding that Manganella's

harassing conduct was in willful violation of the terms of the SPA and Lerner's Code of

Conduct.  Willful has a well-established meaning in the law.  An act is willful if it constitutes

"a voluntary, intentional violation of a known legal duty."  United States v. Pomponio, 429

U.S. 10, 12 (1976) (per curiam).  Cf. United States v. Andrade, 135 F.3d 104, 108-109 (1st

Cir. 1998) (willfulness requires knowledge by a defendant that his acts are unlawful; it

---

[19]Although arguably not a final adjudication, the characterization by the Superior
Court Justice of the arbitrators' findings in her summary judgment decision are worthy of
note.

The findings are binding here if they were essential to the panel's decision.
Manganella argues that they were not, because that decision turned on the
lack of notice and opportunity to remedy.  The argument ignores the crux of
the dispute that was presented to the arbitrators.  The company never
disputed that it had failed to provide notice and an opportunity to remedy; its
position was that it was excused from that requirement on the ground of
futility, because Manganella's misconduct was so egregious that no remedy
could be possible.  To evaluate that claim, the panel had to determine
whether the conduct occurred, and if so, how severe it was.  The panel did
exactly that, in that sequence, finding that the conduct occurred as alleged,
and that it was severe, but that it did not so clearly preclude all possibility of
remedy as to render any effort futile.  The findings were essential to the
outcome, and are therefore binding on the parties in this action.  It follows
that the arbitrator's decision establishes, beyond any genuine dispute, that
the company terminated Manganella for cause as defined in [the
employment agreement].

Id. - Ex. 18 at 20.

15

does not require specific knowledge of the provisions of the law that make them so). <u>See</u> <u>also</u> <u>Commonwealth v. Welansky</u>, 316 Mass. 383, 397-398 (1944) (willful means intentional by design or purpose in contrast to that which is thoughtless or accidental). <u>Cf.</u> <u>Commonwealth v. Redmond</u>, 53 Mass. App. Ct. 1, 4 n.2 (2001) (willfulness requires proof that the actor intended both the conduct and its harmful consequences).

Manganella presumably intends to draw a distinction between conduct that is intentional (which he concedes that his conduct was) and conduct that is undertaken in intentional "disregard of any law or laws that is or are the foundation for the Claim," as provided in the Intentional Acts Exclusion of the policy (which he denies his conduct was). On this issue, the arbitrators' finding of willfulness is conclusive.  To pretend otherwise would be to torture the meaning of the term "willful" beyond recognition.  As Judge Hand explained, "The word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing.  It does not mean that, in addition, he must suppose that he is breaking the law." <u>Am. Surety Co. v. Sullivan</u>, 7 F.2d 605, 606 (2d Cir. 1925).  Even assuming that the law would require more, that is, proof that Manganella knew that his harassment of Burgess was wrong (in the sense that it was condoned by Burgess), that proof is subsumed in the arbitrators' finding that he "inappropriately touched and propositioned" Burgess and that his denials of doing so were unworthy of belief.  The Intentional Acts Exclusion of the policy therefore applies, and Evanston owes Manganella no further defense or coverage.[20]

---

[20]Manganella's final argument is that under federal "common law" preclusion is applied less generously than under Massachusetts law. This, of course, raises the issue whether under <u>Erie R. Co. V. Tompkins</u>, 304 U.S. 64 (1938), a federal court in a diversity

ORDER

For the foregoing reasons, Manganella's motion for partial summary judgment is

DENIED.  Evanston's motion for summary judgment is ALLOWED.  The Clerk will enter

judgment accordingly and close the case.

SO ORDERED.

s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

action would treat preclusion as a rule of substantive or procedural law.  Again, this is an
issue that the court need not delve into as there are no relevant differences between
federal and Massachusetts state law on the fundamental issue of identicality.  See
Gloucester Marine Rys. Corp. v. Charles Parisi, Inc., 36 Mass. App. Ct. 386, 390 (1994).
See also Heacock v. Heacock, 402 Mass. 21, 23 (1988) ("The doctrine of claim preclusion
makes a valid, final judgment conclusive on the parties and their privies, and bars further
litigation of all matters that were or should have been adjudicated in the action.").