UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11264-RGS

LUCIANO MANGANELLA

v.

EVANSTON INSURANCE COMPANY


EVANSTON INSURANCE COMPANY,
Plaintiff-in-counterclaim
and third-party plaintiff

v.

LUCIANO MANGANELLA,
Defendant-in-counterclaim and
JASMINE COMPANY, INC. and
DONNA BURGESS, Third-party defendants

MEMORANDUM AND ORDER ON
JASMINE CO. AND EVANSTON INSURANCE CO.'S
CROSS-MOTIONS FOR SUMMARY JUDGMENT

October 28, 2011

STEARNS, D.J.

Plaintiff Luciano Manganella initiated this action seeking a declaratory judgment

that defendant Evanston Insurance Company (Evanston) had a duty to defend and

indemnify him against a charge of sexual harassment brought by a former employee,

Donna Burgess. At issue is an Employment Practices Liability Insurance (EPLI) policy

purchased from Evanston by Manganella's former employer, Jasmine Company, Inc. (Jasmine). The debate was (and is) over the scope of the coverage provided by the EPLI policy. After extensive discovery, Manganella moved for partial summary judgment on the duty to defend claim. Evanston filed a cross-motion, arguing that Manganella's sexually harassing conduct did not occur entirely within the coverage period (April 28, 1999, to January 3, 2006) and that, in any event, Manganella's "conduct in intentional disregard of applicable law" (the sexual harassment of Burgess) as "established . . . in two prior adjudications," falls within the policy's Intentional Acts Exclusion.

In ruling on the motions, this court found that

[a]t a minimum, Evanston had a duty to investigate the inconsistency between its own records and Burgess's [Massachusetts Commission Against Discrimination] MCAD charge before choosing the version of facts that justified a denial of coverage, while ignoring another under which coverage attached. Given this material dispute of fact, Evanston's denial of a defense and coverage on grounds that Manganella's conduct could not have occurred entirely within the covered period was improper.

*Manganella v. Evanston Ins. Co.*, 746 F. Supp. 2d 338, 346 (D. Mass. 2010). The court nonetheless concluded that the arbitrators' finding that Manganella "inappropriately touched and propositioned" Burgess was binding, that Manganella knew that his harassment of Burgess was wrong, and that his denials were "unworthy of belief." *Id*. Accordingly, the court held that the Intentional Acts Exclusion of the

policy applied and Evanston owed Manganella no further defense or coverage. *Id.* at 348.

In tandem with this action, Evanston filed a Third-Party Complaint against Jasmine and Donna Burgess seeking a declaratory judgment that it had no duty to defend or indemnify Jasmine in connection with a charge filed by Burgess with the MCAD. Jasmine filed counterclaims against Evanston alleging breach of contract and seeking a counter-declaration that Evanston was obligated to pay the costs Jasmine incurred in defending the MCAD charge ($26,386.37) and to indemnify it for the settlement ultimately reached with Burgess ($300,000). Evanston dismissed the Third-Party Complaint against Burgess on December 15, 2010. Jasmine and Evanston now move for summary judgment on the remaining claims.

## BACKGROUND

The court repeats those facts set out in its earlier published opinion to the extent that they are relevant to the current dispute and adds some additional relevant facts gleaned from the parties' exhibits. In 1970, Manganella founded JasmineSola, a women's clothing boutique. As the business flourished, it was rebranded as Jasmine. From 1997, until July of 2005, Manganella was Jasmine's sole shareholder, director, and corporate officer. Manganella sold the company on July 19, 2005, to Lerner New York, Inc. (Lerner). Under the terms of a Stock Purchase Agreement (SPA),

Manganella agreed to continue as Jasmine's President for three years.

In 1998, Jasmine was sued by Sonia Bawa, a former employee, for sexual harassment. In the wake of the lawsuit, Manganella caused Jasmine to purchase an EPLI policy from Evanston. The initial insurance application was completed and signed on November 10, 1998, by Manganella and Burgess, who was then Jasmine's Human Resources Manager. The application stated that, with the exception of the *Bawa* Complaint, Jasmine was unaware of any outstanding instances, real or alleged, of claims of wrongful employment practices (including sexual harassment). *See* Dkt # 36 - Barnett Aff. - Ex. 3 (EPLI Application). In signing the application, Manganella and Burgess "warrant[ed] that to the best of [their] knowledge and belief that the statements set forth [t]herein [were] true and include[d] all material information." *Id.*

On November 13, 1998, Burgess submitted an affidavit in the *Bawa* case stating that: (1) she had overseen personnel matters since commencing work at Jasmine in September of 1997; (2) she shared an office with Manganella; and (3) she was privy to "office gossip." "Nonetheless at no time ha[d she] ever witnessed or heard from anyone associated with the company . . . that Mr. Manganella committed any acts of sexual harassment directed towards Ms. Bawa *or others*."[1] *Id.* - Ex. 4 (1998 Affidavit)

---

[1] Evanston points out that in signing the insurance application on November 10, 1998, Burgess indicated (by checking a box) that she was "*aware* of actual or alleged wrongful employment practices or other facts, incidents or circumstances that may

(emphasis added). Shortly after Bawa filed her complaint against Manganella, Jasmine distributed a written copy of its sexual harassment policy to all of its employees.

Jasmine's coverage from Evanston consisted of a series of one-year policies, the first of which took effect on April 28, 1999. Each year thereafter, through April of 2005, Jasmine completed a renewal application and was issued a new policy. The policies provided coverage for damages incurred because of "Claims" made during the policy period or during an Extended Reporting Period by reason of any "Wrongful Employment Practice," provided that the entirety of the wrongful conduct had taken place during the Policy period (as amended by the "Retroactive Date," namely April 28, 1999). *Id*. - Ex. 1 (EPLI Policy) § III(1). A "Claim" was defined by the Policy as "any written charge or lawsuit, including a charge filed with the Equal Employment Opportunity Commission or similar state or local entity with jurisdiction over employment disputes, seeking 'Damages' or other relief for a 'Wrongful Employment

result in claims" against Jasmine. *Id*. - Ex. 3 (emphasis added). Evanston adds that only Manganella signed the supplement to the application in which he identified and denied the Bawa allegations. Evanston contends that there is no basis for limiting Burgess's affirmation of awareness to the *Bawa* case, that is, that she could have been alluding to Manganella by not adding an addendum to her checkmark. However, there is nothing in the parts of the application completed by Burgess that indicates that she had anyone other than Bawa in mind. Three days after signing the insurance application, Burgess stated under oath in a court filing that at no time had she witnessed or heard that Manganella had sexually harassed anyone. *Id*. - Ex. 4. She has also filed subsequent affidavits and given deposition testimony to that effect.

Practice.'" *Id*. § I(1).   The policy defined a "Wrongful Employment Practice" as conduct with respect to "a current, prospective or former employee that allegedly culminated in . . . a violation of any state, federal or local civil rights or anti-discrimination law and/or fair employment practices law . . . ."[2]  *Id.* § I(7).

Evanston issued a renewal EPLI Policy (No. EP-261249) to Jasmine for the period April 28, 2005, to April 28, 2006.  *See* McDonough Aff. ¶ 2.  On January 3, 2006, Jasmine cancelled the Policy and purchased Extended Reporting Period coverage for claims made and reported during the thirty-six months following the effective date of the cancellation.  Consistent with the terms of the Policy, the Extended Reporting Period endorsement required that any claims made during the period arise out of a

---

[2] In its entirety, the section reads as follows:

"Wrongful Employment Practices" means conduct of an insured with respect to a current, prospective or former employee that allegedly culminated in (i) wrongful termination (including constructive discharge) of an employee (ii) violation of any state, federal or local civil rights or anti-discrimination law and/or fair employment practices (including, by way of example of federal laws, but not limited to Title VII of the Civil Rights Act of 1964 and the amendments thereto, the Age Discrimination in Employment Act and amendments thereto, and the Fair Labor Standards Act and amendments thereto, the Family Medical Leave Act of 1992 and amendments thereto, the Uniform Services Employment and Re-employment Rights Act and amendments thereto, and the Fair Credit Reporting Act and amendments thereto); and/or (iii) commission of a common law tort arising out of and in the course of employment except to the extent that the tort allegedly results in Bodily Injury or property damage.

Wrongful Employment Practice alleged to have been committed between the Retroactive Date of April 28, 1999, and the extended date of cancellation. The Policy also contained an "Intentional Acts Exclusion" barring coverage of any claim made against the Insured

> based on conduct of the Insured or at the Insured's direction that is committed with wanton, willful, reckless or intentional disregard of any law or laws that is or are the foundation for the Claim, or with criminal or malicious purpose or intent; but this exclusion shall not apply to the strictly vicarious liability of any Insured for the wanton, willful, reckless or intentional disregard of another of any law or laws that is or are the foundation for the Claim.

Third Party Compl. - Ex. A - Renewal Policy § IV(1).[3]

In May of 2006, Jasmine hired Stier Anderson, LLC, to investigate a former employee's claim that she had been sexually harassed by Manganella. As part of the investigation, Burgess was interviewed on May 25, May 31, and June 7, 2006. While Burgess recounted incidences of Manganella making inappropriate comments, she

---

[3] The Policy defined the "Insureds" in relevant part as follows:

Each of the following is an insured under this insurance to the extent set forth below:

> 1.  The Named Insured is herein defined as the individual, partnership or corporation named in the Declarations;
> 2.  Any partner, officer, director, stockholder, or employee of the named insured solely while acting within the scope of his duties as such;
> . . . .

assigned no dates to any arguably offensive conduct prior to October or November of 1999. As a result of Burgess's complaint and other allegations, Manganella was placed on unpaid administrative leave. On June 22, 2006, Lerner terminated Manganella citing a "Major Employment Breach"[4] of the SPA – specifically that Manganella had sexually harassed four female Jasmine employees, including Burgess, and had downloaded sexually explicit images on company computers. Lerner also cited Manganella for violating its "Code of Business Conduct."[5]

---

[4] A Major Employment Breach includes "the willful refusal of the Shareholder to comply with any significant, lawful and proper policy, directive or decision . . . if not remedied within thirty days after receipt of written notice from the Company . . . ." Barnett Aff. - Ex. 7 (SPA) § 6.16(E).

[5] Lerner's Code of Conduct in relevant part provides:

Executive Officers, Directors, and Managers have the additional responsibility to lead by example, ensure that other Associates understand and comply with this Code, foster an environment that promotes compliance, and ensure that other Associates understand how to report concerns and understand that there will be no retaliation for doing so.
* * *
We are committed to maintaining a workplace entirely free from illegal discrimination or harassment. We will not tolerate harassment related to any individual's race, color, religion, gender, national origin, citizenship, age, disability, sexual orientation or marital status.
* * *
the term "harassment" may include unwelcome slurs and other offensive remarks, jokes and other verbal, graphic or unwelcome physical conduct. Harassment may also include unwelcome sexual advances, requests for sexual favors or unwelcome or offensive touching and other verbal, graphic or physical conduct of a sexual nature (such as obscene or lewd

On March 19, 2007, Burgess filed an MCAD charge against Manganella, Jasmine, and Lerner. The charge alleged that Burgess had worked for Jasmine and Manganella from 1997 to 2006, and that "[t]hroughout her employment with JasmineSola, Manganella subjected Ms. Burgess to nearly constant physical and verbal sexual harassment." Barnett Aff. - Ex. 20 (MCAD Charge). Burgess also alleged that "Manganella intimidated [her] into engaging in sexual acts with him on the premises of JasmineSola and in other business locations on five occasions . . . ."[6] *Id.* ¶ 1.

As part of the MCAD case, Burgess was asked in an interrogatory to "[d]escribe each occasion on which you claim Luciano Manganella allegedly verbally and/or sexually harassed you . . . ." Burgess responded that "[w]hen [she] first began working for JasmineSola, Mr. Manganella would make off-color comments on taking Viagra and about his sexual relations with his wife. He often made these comments in his wife's presence, and, while they made me uncomfortable, I did not feel personally threatened by them." Nosowitz Aff. - Ex. E.

On March 29, 2007, Manganella notified Evanston of Burgess's MCAD charge.

_____

jokes, comments or displays or any inappropriate body contact).

Barnett Aff. - Ex. 12 at 9.

[6] Manganella denied all of Burgess's allegations and moved to dismiss the charge on, among other bases, statute of limitations grounds. The MCAD denied the motion.

Less than two weeks later, on April 11, 2007, Evanston sent a letter to Jasmine denying coverage because Evanston had determined that the alleged "wrongful Employment Practice" had not occurred entirely between April 28, 1999, and January 3, 2006. Evanston did not cite any policy exclusion, but reserved its right to deny coverage on additional grounds, including the Intentional Acts Exclusion. Evanston did not ask Jasmine for information about the contents of the MCAD charge.

On April 28, 2008, acting on the recommendation of an independent mediator, Jasmine settled with Burgess for $300,000. The settlement agreement did not affect Burgess's claims against Manganella. Jasmine incurred costs of $26,548.87, in defending Burgess's MCAD charge.

In her deposition of April 15, 2011, Burgess testified that she had not felt physically or emotionally threatened by Manganella before October or November of 1999. While Manganella had prior to those dates made comments that Burgess later came to believe were sexually charged and inappropriate, because he had done so in his wife's presence, Burgess did not then feel personally "harassed."[7] Burgess Dep. at 45-46. Burgess further testified that the November 13, 1998 affidavit that she had submitted in the *Bawa* case (stating that she had never witnessed Manganella engaging

[7] Burgess testified that Manganella in his wife's presence questioned whether he should take Viagra given his heart condition, and commented on an employee's thong underwear discernible under her white pants.

in harassment towards Bawa or anyone else, nor had she heard gossip to that effect) "was accurate when written . . . and remains the case today." *Id*. at 46.

Jasmine now moves for summary judgment noting that the factual premise on which Evanston relied in denying coverage – that Manganella's harassing acts could not have occurred entirely within the period of coverage – has been rejected by the court. Jasmine also contends that because Evanston has failed to demonstrate that any of the exclusions of the Policy preclude coverage, Evanston is obligated to reimburse the attorneys' fees and settlement costs that Jasmine incurred in the Burgess matter.

Evanston for its part moves for summary judgment on multiple grounds. First, it argues that because Jasmine's settlement with Burgess was written to encompass "Wrongful Employment Practices" over the entire history of Burgess's employment at Jasmine, a history that predated the settlement by its own terms is not covered by the Policy. Evanston repeats the argument that the Policy excludes coverage for conduct in intentional disregard of applicable law, noting that this court has already found that Manganella's conduct falls within the Policy's Intentional Acts Exclusion.[8] Evanston

---

[8] Evanston also contends that coverage for Jasmine's "intentional wrongdoing" is barred by Mass. Gen. Laws ch. 175, § 47 Sixth(b), which precludes the insuring of a person "against legal liability for causing injury, other than bodily injury, by his deliberate or intentional crime or wrongdoing . . . ." A policy, however, must provide such coverage before the statutory bar comes into play. *See Rideout v. Crum & Forster Commercial Ins.*, 417 Mass. 757, 761 (1994). Because the Intentional Acts Exclusion specifically disavows such coverage, the statute has no relevance.

finally contends that Jasmine's own conduct (in failing to remedy Manganella's conduct towards Burgess) violated Mass. Gen. Laws ch. 151B, and therefore falls within the Intentional Acts Exclusion.[9]

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

The starting point on summary judgment is the court's previous ruling that Evanston had a duty to investigate the inconsistency between its own records and the facts alleged in Burgess's MCAD charge before choosing a version of the facts that justified denying coverage, while dismissing another (equally plausible) version under

---

[9] Although Manganella was Jasmine's President, sole director, and single shareholder, Evanston does not argue that an alter-ego relationship existed such that the corporate veil should be pierced. *See Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form.").

which coverage attached.  During discovery in this phase of the case, Burgess gave

deposition testimony that she did not feel threatened or intimidated by Manganella's

conduct until October or November of 1999 (at the earliest).[10]  This testimony was

---

[10] Burgess testified as follows:

Q:     And was that the first time that he had any unwanted physical contact
       with you?
A:     Yes.
Q:     And is that the first time that you actually felt threatened by him?
A:     Yes.
Q:     And after that, did you then in that – I mean in this time frame of October
       or November of 1999, did you then reconsider the comments, the Viagra
       comment and the thong comment as being threatening?
A:     Yeah, I did at that point.
Q:     Okay
A:     It was almost like he was setting me up for that.
Q:     So beginning in October or November of 1999 is when you first felt that
       Mr. Manganella's workplace conduct was either harassing of you or was
       intended to create a hostile workplace?
A:     Yes, I believe.
Q:     Prior to that time, had you – and again the time being October, November
       of 1999 – had you perceived any of the comments by Mr. Manganella,
       comments of a sexual nature, to be offensive?
A:     Yeah, he could talk – he could say things offensively.
Q:     Okay.  But put it in another way.  After the physical contact in October
       or November of 1999, you revisited the comments about the thong and the
       Viagra and viewed them at that point in October or November of 1999 as
       being offensive comments, right?
A:     I mean, I guess I did.  I's just experienced what I'd experienced.  That
       was the worst of it.
Q:     Okay.  But my question is just whether you had that same physical
       experience or emotional experience prior to that incident in October of
       November of '99?
A:     I didn't feel threatened before that point.

consistent with the statements Burgess had made previously in this and other cases. The shard of allegedly contradictory evidence that Evanston has unearthed is a May of 2006 Interview Memorandum and interrogatory answers filed in conjunction with Burgess's MCAD claim in which she stated that *in hindsight* she had come to believe that two of Manganella's pre-April 1999 comments (whether it was safe for him to take Viagra and whether the outline of a woman's underwear was visible beneath her pants) were "offensive." Whether these comments, standing alone, could make out a claim of sexual harassment is highly doubtful. Single or isolated remarks will not as a rule support a hostile environment claim. *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 783 (1st Cir. 1990). Moreover, to be actionable under Mass. Gen. Laws ch. 151B, an offensive comment must be perceived as such by its target at the time the alleged statement is made. *See Jodoin v. Baystate Health Sys., Inc.,* 2010 WL 1257985, at *17 (D. Mass., Mar. 29, 2010).

Evanston next attempts to shoehorn Burgess's recollection of Manganella's pre-Policy statements into the "continuing violation" doctrine of *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521 (2001). The continuing violation doctrine is grounded in equity and intended to ameliorate the potentially draconian effects of the relatively short statute of limitations that governs Chapter 151B claims. (In 1999, a

Burgess Dep. at 42-43.

plaintiff was required by Mass. Gen. Laws ch. 151B, § 5, to file a charge with MCAD

within 180 days of the occurrence of the alleged discriminatory event). In *Cuddyer*, the

Supreme Judicial Court stated:

> an employee who suffers from recurring acts of abusive sexual verbal or physical conduct that, over time, rise to the level of a hostile work environment may be unable to appreciate the true character and enormity of the discriminatory environment until after it has continued for an appreciable length of time. A hostile work environment constitutes a *pattern of sexual harassment* (these are the operative words) that, by its very nature, often is apparent only in hindsight.

*Id*. at 538 (citation omitted).  Evanston argues that the fact that Burgess did not take

Manganella's pre-Policy statements seriously when they were made

> is in no way inconsistent with the fact that the statements contributed to and culminated in an actionable sexually hostile work environment, and they constitute part of Mr. Manganella and Jasmine's Wrongful Employment Practice. Because the Wrongful Employment Practice happened in part before the Policy's retroactive date, it is not covered under the Evanston Policy.

Evanston Mem. at 6-7.  The SJC's purpose in *Cuddyer* in applying the continuing

violation doctrine was to *expand* the window of relief for a plaintiff subjected to

recurrent sexual abuse.  To apply the continuing violation theory to *shrink* the relief

available to an insured (as Evanston urges) runs contrary to the equitable principles that

infused the *Cuddyer* decision.[11]

_____

[11] It is also worth noting that in *Cuddyer*, the issue was whether plaintiff's claim was barred by the fact that she concededly *knew* that she was being sexually harassed

In the alternative, Evanston argues that the court should revisit its original duty to defend determination based upon the SJC's subsequent opinion in *Billings v. Commerce Ins. Co.*, 458 Mass. 194 (2010) – decided two weeks after the court's October 26, 2010 decision in this case. In *Billings*, the SJC held that

> [a]n insurer has a duty to defend an insured when the allegations in a complaint are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms. The duty to defend is determined based on the facts alleged in the complaint, and on facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint. . . . "In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Sterilite Corp. v. Continental Cas. Co.*, 17 Mass. App. Ct. 316, 319 (1983), quoting *Union Mut. Fire Ins. Co. v. Topsham*, 441 A.2d 1012, 1015 (Me. 1982). "However, when the allegations in the underlying complaint 'lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant.'" *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 394-395 (2003), quoting *Timpson v. Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 347 (1996).

*Id*. at 200-201. Evanston points to the SJC's "clarification" that its decision in *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 10-11 (1989), was not intended to alter the standard established in *Desrosiers v. Royal Ins. Co. of*

---

prior to the cut-off date for her administrative filing. *See Cuddyer*, 434 Mass. at 530, 534. Here, we have the reverse. The incontrovertible evidence is that Burgess only recognized the potentially harassing character of Manganella's comments after coverage under the Policy had attached.

*Am.*, 393 Mass. 37, 40 (1984), that "the obligation of the insurer to defend is based not only on the facts alleged in the complaints but also on the facts that are known *or readily knowable* by the insurer." (Emphasis added). Evanston argues that the MCAD charge supports its determination that there was no duty to defend Jasmine in the MCAD action.

I disagree. The court's earlier opinion considered Burgess's MCAD charge at length.

> Evanston relies on the statement in Burgess's charge that the harassment occurred throughout her employment with Jasmine (which began in 1997), that is, that it commenced prior to the April 28, 1999 Retroactive Date. Evanston also points to the Intentional Acts Exclusion of the policy and argues that two prior adjudications (the arbitration proceedings and Superior Court case) have established both that Manganella's harassment of Burgess was willful and that it was committed with knowledge that it was unlawful. The court agrees with Manganella that a material dispute of fact exists as to whether the alleged Wrongful Employment Practice occurred entirely within the insured period, that is, from April 28, 1999, to April 28, 2006. While Burgess stated in her MCAD charge that she began working for Jasmine in September of 1997, and that "Manganella subjected [her] to nearly constant physical and verbal sexual harassment," she specified no dates – only that Manganella harassed her "throughout her employment." Moreover, Evanston had in its file the initial EPLI application in which Burgess stated that, with the exception of the Bawa complaint, as of November 10, 1998, she personally was unaware of any other actual or alleged Wrongful Employment Practices at Jasmine. Moreover, Burgess had filed a sworn statement in the *Bawa* case in November of 1998, attesting that she was privy to "office gossip" and "at no time ha[d she] ever witnessed or heard from anyone associated with the company including Ms. Bawa that Mr. Manganella committed any acts of sexual harassment directed towards Ms. Bawa or others." 15

Barnett Aff. - Ex. 4 (Burgess Aff. ¶ 3).

*Manganella*, 746 F. Supp. 2d at 345-346.  Given these facts, the court held that, at the very least, Evanston had a duty to investigate the potential discrepancy.

Instead, Evanston not only abdicated its duty to investigate the facts, it also peremptorily jettisoned Jasmine, its insured.  Because Evanston breached its duty to Jasmine to provide a defense, the court agrees with Jasmine that Evanston is liable for the costs of the settlement it reached with Burgess.  It is true that when an insurer breaches its duty to defend, there is no automatic right to indemnity.  *See Polaroid Corp. v. The Travelers Indem. Co.*, 414 Mass. 747, 762 (1993).  But, "an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage."  *Id*. at 764.  Because the evidence on this latter issue is in equipoise, Evanston has not met its burden of showing that coverage did not attach.

Evanston next argues that because Manganella was Jasmine's sole officer, director, and shareholder, the same facts that implicate Manganella in harassment establish "that Jasmine intentionally harassed Burgess."  Evanston Mem. at 8.  Evanston relies in this regard on Justice Fabricant's decision in the wrongful termination action brought by Manganella against Jasmine in the Massachusetts Superior Court.  In that action, Justice Fabricant found that the arbitration panel's

findings were binding.

> The arbitration panel found that Manganella sexually propositioned several employees and inappropriately touched and propositioned one, that the victims did not complain out of fear of adverse consequences, and that the victims were "wounded" by Manganella's conduct. Those factual findings leave no room for doubt that Manganella's sexual advances created a hostile work environment for the victims. Where the person committing sexual harassment is a supervisor, Massachusetts law attributes the conduct to the employer. *See College-Town Div. of Interco, Inc., v. Mass. Comm'n Against Discrimination*, 400 Mass. 156, 165 (1987). Thus, the arbitrator's findings establish that Manganella intentionally caused the company to violate Massachusetts law. Materiality cannot be open to serious question; the statute, regulations under it promulgated by the Massachusetts Commission Against Discrimination, and myriad cases decided by courts at all levels and by that agency recognize the prohibition on sexual harassment as a matter of substantial importance to employers, employees, and the public. Indeed, the arbitrators found Manganella's conduct, in their term, "reprehensible" . . . . Thus, the arbitrators' findings, if they bind Manganella here, establish the elements necessary to show cause for his termination . . . .

*Manganella v. Jasmine Co., Inc.*, 2007 WL 3244436, at *10 (Mass. Super., Oct. 16, 2007).

The reason Evanston's argument fails (apart from Jasmine's legally separate corporate identity) is this. Justice Fabricant based her liability finding on the *College-Town* decision (cited in the quoted portion of her Memorandum). In *College-Town*, the SJC found a corporation "vicariously liable for the [harassing] acts of its agents – its supervisory personnel." *Id*. at 165. As Jasmine points out, the Policy issued by Evanston specifically covered Jasmine as a Named Insured against "strictly

vicarious liability . . . for the wanton, willful, reckless or intentional disregard of another." Evanston's response is that Jasmine's liability under Chapter 151B cannot be deemed vicarious because the concept of vicarious liability is borrowed from the common law of torts – while Chapter 151B imposes "direct statutory liability" (which is not included in the Named Insured Exception).[12] There is simply no evidence, despite what Evanston says, that the SJC has reversed its holding in *College-Town* that an employer's liability under Chapter 151B, § 4(1), is based on the principle of vicarious liability.

The two cases that Evanston cites for the proposition that Chapter 151B eschews vicarious liability and instead imposes "direct liability on the corporate employer" in fact reaffirmed the holding of *College-Town* with respect to Chapter 151B, § 4(1), the provision of the statute under which Jasmine's liability for Manganella's acts is based. *See, e.g.*, *Thomas v. EDI Specialists, Inc.*, 437 Mass. 536,

---

[12] If there were any doubt on this score, Evanston's tortured reading of the meaning of the exclusion cries for the application of the rule that exclusions are to be strictly construed against the insurer. "Interpretation of the language of the exclusion presents a question of law. . . . In this interpretation, we are guided by three fundamental principles: (1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words. . . . (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, . . . and (3) doubts created by any ambiguous words or provisions are to be resolved against the insurer." *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass. App. Ct. 318, 323-324 (1991).

539-540 (2002); *Thomas O'Connor Constr., Inc. v. Massachusetts Comm'n Against Discrimination*, 72 Mass. App. Ct. 549, 557-558 (2008) (the cases cited by Evanston). In *Thomas O'Connor Construction,* an African American employee of a subcontractor filed a hostile work environment claim against the general contractor at the work site. The Court of Appeals found the general contractor liable because after receiving notice of a supervisor's racist comments, it failed to take steps to remedy the discrimination. The Court of Appeals based its holding, in part, on the fact that the "chain of command" protections contained in § 4(1) did not apply to the employee's § 4(4A) claim. As the Court noted

> [s]ignificantly, in our view, *College-Town* limited the employer's *vicarious* liability under § 4(1) to the acts of its supervisory personnel, not
those of all of its workers, as would have been the case in a common-law tort. We note, as well, that the considerations relied on in *College-Town* for holding an employer vicariously liable under § 4(1) for its supervisor's discriminatory actions either do not exist, or exist with diminished force in the context of a claim under § 4(4A) by a person like [plaintiff] who is not part of the employment unit.

*Thomas O'Connor Constr.*, 72 Mass. App. Ct. at 559 (Emphasis added).

Evanston's reliance on *EDI Specialists, Inc.*, is also misplaced. In *EDI,* the SJC denied an employer's third-party claim for contribution from an offending supervisor in a sex discrimination suit against the company (notably plaintiff's claims included counts against EDI for its failure to adopt company policies regarding sexual harassment and maternity leave). The Superior Court dismissed EDI's claim finding

that "the right to seek contribution only applies to tort claims, and a claim under c. 151B is not a tort." *EDI*, 437 Mass. at 538. The SJC pointedly ignored this ruling in upholding the lower court on another ground, namely that the Legislature in expressing a preference for resolving Chapter 151B claims administratively chose to omit the right to contribution from its "comprehensive" remedial scheme.[13] *Id*. at 540.

ORDER

For the foregoing reasons, Jasmine's motion for summary judgment is ALLOWED, the court having determined that Evanston is liable under the Policy for the costs of defending and settling the Burgess claim. Evanston's cross-motion for summary judgment is DENIED. Jasmine as the prevailing party will within ten (10) days of the date of this Order submit a proposed Form of Final Judgment.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[13] Justice Cowin specifically stated that "[o]ur prior cases recognize that, in some but not all respects, actions brought under G.L. c. 151B are analogous to tort actions. Even if G.L. c. 151B can be considered "tort-like" for some purposes, allowing an action for contribution would undermine the statute's complex and detailed procedures; the Legislature could not have intended such a result." *Id*. at 539-540.